BRICKILL et al. v. MAYOR, ETC., OF CITY OF NEW YORK et al.

(Circuit Court of Appeals, Second Circuit. October 30, 1901.)

No. 128.

1. PATENTS—INVENTION—WATER HEATER FOR FIRE ENGINES.

The Brickill patent, No. 81,132, for a feed water heater for steam fire engines, was not anticipated, and shows invention, which, although not of a high order, is sufficient to sustain its validity in view of the practical success of the invention.

2. SAME—INFRINGEMENT—PROFITS RECOVERABLE.

The only element of the apparatus shown in such patent, however, which discloses patentable novelty, is the supplemental tank with which the heating coil is connected when disconnected from the boiler of the fire engine, the purpose of which is to keep up the circulation of water through the coil, and preserve it from injury, when the engine is absent on duty, and the claim must be so construed as to include such tank and its connections; hence, in an accounting for damages and profits for infringement, the infringer can only be charged with the profits accruing from the use of such tank and its connections, and not for those accruing from the use of the heating coil itself, which, as an old and well-known device, was open to use by the public.

Appeal from the Circuit Court of the United States for the Southern District of New York.

See (C. C.) 98 Fed. 113.

John R. Bennett, for appellants.

Raphael J. Moses and J. A. Hudson, for appellees.

Before WALLACE, BROWN, and THOMAS, Circuit Judges.

WALLACE, Circuit Judge. The defendants have appealed from a decree awarding the complainants a recovery for $951,070 for the infringement of letters patent No. 81,132, granted August 18, 1868, to William A. Brickill, for "improvement in feed water heaters for steam fire engines." The assignments of error raise the questions of the novelty of the patented improvement, and of the amount recoverable as profits derived from its use by the defendants if the patent is adjudged valid.

The patentee, a machinist, while in the employ of the fire department of the city of New York as an engineer in charge of one of the steam fire engines, devised the apparatus described in the patent as a substitute for the contrivances which had previously been used by the department for maintaining hot water in the boilers of its steam fire engines without keeping the engines fired up while they were standing in the engine houses awaiting service calls. After the reorganization of the department in the fall of 1865, the board of commissioners deemed it important that the engines be constantly ready upon receiving an alarm call to get up steam enough in the boiler to operate the pumps by the time of reaching the place of fire. It was quite expensive, and undesirable for other reasons, to keep them fired up all the time they were idle, and it took six or seven minutes to get up steam with cold water in the boiler after starting the fire in the fire box. Within the five or six months fol-

lowing the reorganization the board tried various means for keeping the water in the boilers heated to about the boiling point without keeping the engines fired up. One contrivance used, called the "ring burner," was a coil of iron pipe connected by a flexible tube with the gas supply of the engine house, and having apertures in its upper side. It was placed beneath the boiler, resting upon the fuel in the fire box. When the engine was awaiting a call, the gas was kept burning in the coil, and when a call was received the gas was turned off, the coil removed, and the fuel lighted. Subsequently more elaborate contrivances were used. These consisted of a coil or cluster of iron pipe (in some instances a coil and in some a cluster), inclosed in a sheet-iron casing, secured to the side or the rear of the boiler of the engine, and fed with water from the boiler, the water being heated by gas by means of burners placed beneath the coils and connected with the gas supply, as the earlier coils had been. A pipe led from the upper end of the coil or cluster into the boiler at or near the water line, and another from the lower end led into the boiler near the bottom, and at a point seven or eight inches beneath the other. The coils and clusters were permanently attached to the boiler, and went with the engine upon service calls. When the engines were awaiting calls, the gas was kept burning, and when a call was received the gas supply was disconnected. This contrivance heated the water by the well-known circulating system. It proved sufficiently satisfactory to lead to the equipment of many of the engines with it. But a greater consumption of gas was required for heating than by the ring burner, and the latter was still used with some of the engines. Brickill conceived the practicability of heating the coil used on his engine by a coal fire, and obtained permission from the board to construct and try his apparatus. He proposed to place the coil on the grate of a stove, and connect it with the boiler by detachable couplings. His apparatus was constructed and tested. A contrivance known as the "Dinham Boiler" was then tried upon one of the engines. This was a cylinder set up in the engine house near the engine, and heated by a coal fire. It had a pipe leading to the boiler of the engine, and another connecting it with the Croton water supply. When it was heated sufficiently, steam was generated, and entered the boiler at the bottom, thereby heating the cold water. Upon receiving a call, the pipe was disconnected from the engine boiler, and the Croton water turned into the cylinder. The apparatus injected steam into the water of the engine boiler, thereby increasing the quantity of water in the boiler, and necessitating the drawing off of the water from time to time to maintain it at its proper level. The board's committee on apparatus, after examining Brickill's and also the Dinham apparatus, reported that they found both to supply a highly important and economical arrangement for preserving hot water in the boilers, and recommended that the superintendent of repairs equip the boilers with the necessary apparatus, leaving it to him to select which one he saw fit. The superintendent concluded to adopt Brickill's apparatus. Thereupon all the steam fire engines were equipped with it, or with apparatus embodying its most valuable parts, and there-

after it was used on them throughout the life of the patent.   Brickill remained as an employé of the department until the fall of 1868, in the meantime having obtained a patent for his apparatus.   In October, 1870, he made a formal demand upon the department for compensation for the use of his apparatus, representing that upon the 37 engines with which it had been used there had been effected an annual saving in the expense for fuel of $14,923.40.   No definite action upon this demand was ever taken by the department.

The following are the material parts of the specification of the letters patent:

"The nature of the present invention consists in combining with a steam fire engine a water heater, so constructed and connected to the boiler of the steam fire engine that the water in the same is made to pass through the heater and become heated, so that steam may be more rapidly generated than if my invention were not used in connection with the engine.   *   *   * To enable those skilled in the arts to make and use my invention, I will describe the construction and operation of the same.   A shows a box or receptacle for the heater, B, and having within it a grate to support the first. C and C² are water pipes leading from the heater, B, to a water tank, D, as hereinafter described; and E and E² are branch pipes connected with and running from the pipes C and C² to the rubber pipes or tubes, F, which are intended to form the connection between the boiler of the engine and the heater, B."

"G and G² show cocks upon the pipes C and C², which cocks may be opened or closed, as desired, by the elongated socket wrenches H and H², operated in turn by the flat wrenches, I, placed on their upper ends."

"D is a water tank, through the bottom of which the end of the pipe C² enters, while the end of the pipe, &, enters the same about centrally, or a little above the center of the tank D."

"Such being the construction, the operation is as follows:

"The heater may be connected with the boiler of a steam fire engine by inserting the ends of the rubber tubes in the boiler of the engine, one a short distance above the other, so that one shall receive the cold water from the boiler, and convey it to the heater or coil, B, while the other shall receive and conduct the water, when heated, from the heater to the boiler of the engine, thus establishing and maintaining a free circulation between the heater and the boiler."

"The elastic nature of the pipes or tubes, F, allows the engine to be placed in any desired position in the engine house, or to be moved in any desired direction to a certain extent, without the necessity of disengaging the heater from the engine."

"The connection between the tubes and the boiler may be made in any convenient manner, generally a coupling for connecting the two being preferred, which at any moment may be readily detached, and allow the connection between the tubes and the boiler to be instantly broken."

"As soon as an alarm of fire is given, the engine is detached from the heater, and proceeds to the fire.   During the absence of the engine communication between the water tank, D, and the heater, B, is established by opening the cocks G and G² upon the pipes C and C², by which the heater is supplied with water from the tank, D, which, when heated, is returned to the tank, as in the case of the boiler; the object being to preserve the coil or heater."

"I am well aware that the form of heater used, as well as of supplying water to the same after the engine has been detached therefrom, may be varied without changing the nature of my invention, which, as already set forth, consists in connecting to or combining with a steam fire engine a heating apparatus, so that water heated to nearly the boiling point may be supplied to the boiler of the engine, that steam may be more rapidly generated; and consequently I do not wish to be understood as intending to claim any peculiar arrangement of heating apparatus herein shown."

The claim of the patent is as follows:

"The combination with a steam fire engine of a heating apparatus, constructed substantially as described, for the purposes fully set forth."

It will be seen that the specification describes a heating apparatus in which the ends of the coil, which is the receptacle for heating the water, lead into the engine boiler in substantially the same relations as did those of the permanently attached coils which had been used by the department. Brickill in effect transferred one of these coils to the grate of a stove, elongated the tubes leading from the lower and upper ends to the boiler so as to connect them with a boiler located some distance from the coil, using rubber a part of the distance, and inserted coupling devices for readily coupling and uncoupling the connections; and he also incorporated into his apparatus a tank with water pipes leading to it from the heater coil, and connections between those pipes and the pipes leading to the boiler, so that the communication between the water tank and the heater coil could be established when communication between the heater coil and the boiler was discontinued, the object being to preserve the coil and connecting pipes from being injured by the fire when the heater was not receiving water from the boiler by supplying it with water from a tank. Such an apparatus is adapted for the use of coal or wood as fuel, and obviously can be operated more economically than one requiring the use of gas.

It is insisted for the appellants that the patent is void for want of novelty, and that Brickill's apparatus merely required the exercise of ordinary mechanical skill in adapting for use with a steam fire engine well-known devices for heating water in a boiler by maintaining circulation between it and the water in a heater, and for furnishing the water supply and coupling and disconnecting the parts, and did not involve invention. The expert witness for the complainant was of the opinion that the novel features of the apparatus consisted in the flexible connections between the heater and the boiler and the means for readily coupling and uncoupling them, and also in the tank and means for transferring the circulation of water from the coil and boiler to the coil and tank, and vice versa.

Apparatus in a variety of forms was old for heating water in a boiler by heating water in a separate reservoir and establishing circulation between two bodies of water. In such apparatus it was customary to connect a reservoir with the water space of a heater by tubes or pipes so arranged that one of the pipes would receive the cold water from the reservoir and convey it to the heater space, and the other would convey the water when heated to the reservoir. It was essential in every such heating apparatus that one of the tubes should enter the reservoir at some little distance below the other, as otherwise no circulation would be established, and this was uniformly the arrangement. The common kitchen range or stove is a familiar example. That was a feed heater in which the water was conveyed from the boiler to the water back by a pipe leading from its lower part to the lower part of the water back, was heated by the fire surrounding the water back, and then was conveyed back to the boiler by a pipe leading to the upper part of the

boiler. It was not new to substitute a coil heater in place of the or-dinary water back, and arrange it near the fire of the stove, with circulation pipes connecting with the boiler, one leading from the lower end of the coil and the other from the upper end, the latter entering the boiler some distance above the former. This suffi-ciently appears from the patent of 1864 to McIntyre and Meginnity. There was no novelty in the coupling devices for connecting and dis-connecting the circulation tubes. This is conceded by the expert for the complainant, and is apparent from the statement in the spec-ification that "the connection between the tubes and the boiler may be made in any convenient manner; generally a coupling for con-necting the two, which at any moment can be readily detached." We cannot think that the introduction of flexible tubes imparted patentable novelty to the apparatus. This was desirable in order that the fire engine would not be required to stand in any exact posi-tion in the engine house in order to be coupled to the heating appa-ratus, but it would seem to have been an expedient obvious to any intelligent mechanic, as obvious as it was to substitute a rubber tube for the ordinary gas pipe in heating the coils which the department had used.

If Brickill's apparatus had omitted the tank and the means of changing the circulation of water from the tank to the heater and boiler and from the heater and boiler to the tank, he would have done nothing more than transfer the coils or clusters and their con-necting pipes in use by the fire department, which had been attach-ed to the engine boilers, to a new location, and adapt them for use in that location by adding the obviously suitable appliances of flexible connections and well-known devices for readily coupling and uncoup-ling them from the boilers. The coil in his apparatus is arranged, as were those coils, to heat the water in the boiler by circulation. Those coils had been connected with the boiler, as the specification points out his coil is to be, by leading the ends into it "one a short distance above the other." There was no novelty in locating the coil in a stove where it could be heated by coal, and, if there was none in introducing the flexible connections and the coupling devices, the apparatus would have been destitute of invention in view of the prior patent to McIntyre and Meginnity alone. By introducing the tank and its connections the feed water heating apparatus was per-fected for the special use in which it was to be employed. These appliances were not indispensable, and the heater would have per-formed its function of heating water in the boilers if they had been absent; but they contributed to the value of the apparatus, and made it complete. They enabled the coil to be kept heated while an en-gine was absent in service without danger of burning it out and cracking the tubes. This, no doubt, could have been accomplished by regulating the draft of the stove, but the merit of the appliances is not disproved merely because they were not the only ones capable of accomplishing the same result. If they accomplished it in a new way, and to devise them involved thought and ingenuity beyond the ordinary skill of the calling, they were features of patentable nov-elty. We do not regard the prior patents for improvements in

cheese-making apparatus as sufficient per se to negative invention in introducing and adapting these appliances. The appliances for a double hot-water circulation shown in those patents are quite dissimilar in details of construction and arrangement to those of the patent in suit, and it is doubtful whether their use in supplying heated water to control the temperature of milk during the process of cheese making can be regarded as a cognate use.

As organized, the heating apparatus supplied a practical and efficient adjunct to the fire engines, and its value is shown by its adoption and use by the officers of the fire department, and the fact that after it was introduced there was no attempt by them to find a substitute for it, or to improve it. In short, it fulfilled the requirements of the service for which it was designed with a degree of success not before attained or subsequently exceeded. It did not evince a high order of inventive talent to organize and construct it, but we think it did evince enough of thought and creative faculty to support a patent, and re-enforce the presumption of validity arising from the grant.

Among the defenses interposed was that of an implied license to the defendants to use the invention. This defense was based upon Brickill's conduct in equipping two of the steam fire engines of the fire department with his patented apparatus before making his application for a patent, and in permitting other engines to be equipped with it while he remained in the employ of the department. The court below was of the opinion that a license to use the invention with the first two engines was to be implied, but that none was to be implied as to the others. There is no assignment of error challenging the correctness of the decree in respect to this defense. The defense was not argued at the bar, although it is urged in the brief for the appellants. Under the circumstances we do not feel called upon to consider it further than to say that we think the court below disposed of it correctly.

The views which have been expressed compel a construction of the claim which incorporates into it the tank and its connections as constituents. The terms of the claim, read with the descriptive matter of the specification, would seem to require such a construction; but, inasmuch as the patent would be void for want of inventive novelty if these constituents were omitted, this construction is imperative.

In adjudging the recovery of profits for which the defendants have been made liable the decree in the court below has proceeded upon a misconception of the scope of the patent. Profits were awarded upon the accounting upon the basis of the saving to the defendants during the term of the patent of the difference in cost between keeping the water in the engine boilers of the fire department heated by coal instead of by gas as fuel. This was upon the theory that, as Brickill was the first to contrive apparatus in which the heating could be practically accomplished by using coal as the fuel, his patent was to be regarded as a pioneer. It is not a pioneer in the most latitudinarian sense of that much abused term. It is true he was the first to use for the heating of water in a steam fire engine boiler the well-known devices for heating water in one reservoir by heating water

with coal or other fuel in another and establishing circulation between the two bodies of water. In doing this he was merely applying old devices to use on a new occasion, and his patent would have been void for want of invention had it not been that in the organization of his apparatus he introduced supplementary devices which had nothing to do with heating the water, but were useful in preserving some of the other parts, and which, because they were new, gave patentable novelty to his apparatus as an entirety. In such a case the infringer is not liable to the patentee for the profit he has made by the use of the entire apparatus. He is liable only for such as has accrued from the use of that part of it which was new, and which he has used without right. McCreary v. Canal Co., 141 U. S. 462, 463, 12 Sup. Ct. 40, 35 L. Ed. 817.

The defendants have been held liable as though the tank and its connections formed no part of the invention secured by the patent, and in the accounting before the master the consideration that the use of the rest of the apparatus was open to the public was ignored. No evidence was introduced before him for the purpose of showing the relative expense or gain of using the patented apparatus and similar apparatus without the tank and the tank connections; in other words, there was none directly to the question of profits realized by the defendants by using that part of the apparatus which they were at liberty to use without accountability to the complainants.

In estimating the saving the defendants were charged with the difference in cost between heating by using coal with the patented apparatus and using gas for fuel with the so called "ring burner." This assumes that the ring burner was the only practical contrivance which could have been resorted to. We are of the opinion that the Dinham apparatus should not have been disregarded as a standard of comparison. It was used for several months, not experimentally, but in the ordinary course of business at the engine house. It was less acceptable to the employés of the department than the patented apparatus, and they were annoyed because its use required them to keep watch upon the quantity of water in the boiler and frequently draw the water off; but we do not entertain any doubt that it supplied an efficient and practical instrumentality for heating the boilers at a cost not greatly, if any, more than by the patented apparatus.

Among the exceptions by the defendants to the master's findings which were overruled by the court below upon entering the final decree there were several which sufficiently raised the question whether the correct standards of comparison were adopted by the master in ascertaining the profits for which the defendants were responsible. Because of error in overruling these exceptions the decree should be reversed, with instructions to the court below to order a new accounting, and such further proceedings as may be consistent with this opinion and conformable to equity, and it is accordingly so ordered.